**CUMBERLAND FARMS NORTHERN, INC.**

v.

**MAINE MILK COMMISSION.**

Supreme Judicial Court of Maine.

Nov. 17, 1967.

Berman, Berman, Wernick & Flaherty, by Sidney W. Wernick, and Christopher A. Moen, Jr., Portland, for plaintiff.

John W. Benoit, Asst. Atty. Gen., Augusta, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN and DUFRESNE, JJ.

TAPLEY, Justice.

On report. The case is presented on the pleadings, the transcript of the public hearing held by the Maine Milk Commission on December 3 and 4, 1963, the exhibits presented to the Commission, the March 20, 1964 findings and conclusions of the Commission, the Commission's schedule of prices effective April 1, 1965, the Commission's Order No. 1, as amended, issued April 1, 1964, the opinion and order of a presiding Justice of the Superior Court, bearing date August 30, 1965, the supplemental findings and conclusions of the Commission dated October 21, 1965, and the docket entries.

As a result of the hearing on December 3 and 4, 1963 the Commission issued its findings on March 20, 1964 which became effective on April 1, 1964, as did the milk prices. The plaintiff (hereafter referred to as Cumberland), by complaint, sought review of the Commission's findings. The Commission answered by filing a motion to dismiss the complaint for the reason that Cumberland was not entitled to seek a review in view of the language contained in the Maine Milk Commission Law. This question was reported to the Law Court, Cumberland Farms Northern, Inc. v. Maine Milk Commission, 160 Me. 429, 205 A.2d 539. The Law Court determined that Cumberland was legally entitled to a review remanding the case to the Superior Court

for further proceedings. The Justice below, by consent of counsel, made a determination based upon the documents submitted to the Commission, oral and written arguments. He, in turn, remanded the case to the Maine Milk Commission, "for a review of its orders, findings and conclusions relating to the prices complained of in the appeal and for the assignment of more specific reasons therefor with or without further hearings or in the alternative for an adjustment of said prices and an assignment of specific reasons therefor with or without further hearings." According to the findings below the Justice remanded the case to the Commission because,

"In order to satisfactorily meet the statutory objective and in the best interest of the producer, the dealer and the consumer this Court feels that the Commission ought to review the price schedule together with its findings and justify the current prices by giving more specific reasons for them either with or without further hearings as it may deem proper under the circumstances and in the light of this decision. Such a review by the Commission is a condition precedent to any determination by this Court as to whether or not errors of law were committed by the Commission and if so to correct them."

Pursuant to the remand order the Commission, on October 21, 1965, issued supplemental findings. By agreement of counsel the case was reported to the Law Court. In substance, the issues are:

1. The Commission was in error in denying Cumberland proposal regarding the establishment of a price for its cash and carry method of sales.

2. The Commission committed error when it did not establish a price differential for one-half gallon sales of milk in single service containers (paper) as against returnable containers (glass).

3. The Commission erred in continuing the existing gallon price and establishing it as the price for gallon sales in returnable containers and by increasing that price by 4¢ per gallon sales in single service containers.

4. The Commission erred in establishing a price for unflavored skim milk and not determining a price for flavored skim milk.

The price fixing statute provides:

"Prices so fixed shall be just and reasonable taking into due consideration the public health and welfare and the insuring of an adequate supply of pure and wholesome milk to the inhabitants of this State under varying conditions in various marketing areas, seasonal production and other conditions affecting the costs of production, transportation and marketing in the milk industry, including a reasonable return to the producer and dealer." 7 M.R.S.A., Sec., 2954, Page 710.

Cumberland complains that the Commission did not give consideration to the evidence submitted to it concerning "other conditions affecting the costs of production, transportation and marketing in the milk industry, * * *" as required by statute.

Cumberland introduced into Maine a new and different method of distribution of milk. Previously marketing methods were by home delivery and store sales. Cumberland conducts a cash and carry operation from its own stores from which the consumer can enjoy the benefit of lower prices if he is willing to forego the service.

Cumberland sells its milk in half-gallon and gallon glass containers exclusively in retail stores. A deposit charge is made for the container in order to, in some degree, insure its return. Cumberland employs no paper containers in its packaging as it contends the cost is less in the use of the glass container, both in filling and distributing. There was testimony before the Commission introduced by Cumberland of other cost saving factors.

Cumberland complains that the Commission in its findings has ignored or refused to give consideration to all the cost factors associated with all methods of distribution and sizes of containers, particularly those involved in the type of operation conducted by Cumberland.

Cumberland further contends that the Commission, in limiting itself to the lower cost container factors and refusing to include consideration in detail of all cost factors and savings in their entirety incident to all operations by which milk is marketed in retail stores, has acted arbitrarily and illegally.

Cumberland, in effect, says that the Commission has failed to comply with the statutory requirement of taking into due consideration, "other conditions affecting the costs of production, transportation and marketing in the milk industry, * * *."

Emphasis is laid on the contention that the findings of the Commission, both of March 20, 1964 and the supplemental findings issued pursuant to the order of the lower court of October 21, 1965, contain no logical or substantial findings which would present a basis for evaluation by the reviewing court.

"Where express findings of fact are necessary these findings must at least state the ultimate facts which are essential to an administrative determination, and without such a finding the finding of the basic or evidentiary facts may be deemed insufficient. On the other hand, required findings of fact should be made specifically and not generally. Findings should be a recitation of the basic facts established by the evidence as found by the trier of the facts, from which may be inferred the ultimate facts in terms of the statutory criterion required as a basis for a particular order. A mere finding of ultimate facts, a finding solely in terms of the statute, or the statement of a conclusion, without a finding of the basic or underlying facts on which the admini-strative agency deems such ultimate fact or conclusion to rest, is, as a general proposition, regarded as insufficient to support a determination. ...... A reviewing court cannot properly exercise its function upon findings of ultimate fact alone, but also requires findings of the basic facts which represent the determination of the administrative agency as to the meaning of the evidence, and from which the ultimate facts flow." 2 Am. Jur.2d Administrative Law, Sec. 456.

There is some similarity in the factual problems and questions of law in a New Jersey case which obtain in the case we now have under consideration. In Lampert Dairy Farm, Inc. v. Hoffman, 37 N.J. 598, 182 A.2d 857 (N.J.) (1962), at page 859, the court said:

"We have reviewed the record compiled by the Director at the supplemental hearings. The testimony elicited, unlike the hearing held prior to the first appeal, delved deeply into the operations of the appellants and now presents us with a much clearer picture of the nature of their operations. Before the record was supplemented, we understood that each of the appellants sold most of its milk in one-half gallon and gallon containers. The record now reveals that though these dealers do not uniformly sell most of their milk in the larger containers, they do sell proportionately more of their milk in one-half gallon and gallon containers than do dealers in the area generally. We also learned for the first time that they sell their milk almost exclusively through retail stores. On the other hand the 12 dealers, whose composite records the Director has accepted as a representative cross section of the industry, sell most of their milk in quart containers delivered to the home or wholesale to stores."

and again on page 860, 182 A.2d on page 860:

"We believe that a minimum price should be established only after the Di-

rector has considered those cost factors consistently associated with the method of distribution and size of container to which the price applies. Any composite study such as the profit-and-loss statement of the 12 dealers which was the basis for the proposed schedule in Order 60–4 can shed no light on these factors. The composite profit-and-loss statement of the 12 dealers contains no breakdown of the costs relating to methods of distribution or container sizes, i. e., the differentials among dealer to consumer, dealer or subdealer to store, store to consumer, dealer to subdealer, quarts to one-half gallons, and quarts to gallons. And the study of the operations of the appellants did not uncover cost data sufficient to sustain the propriety of the proposed minimums in relation to each other."

The Commission in its supplemental findings made no cost differential applicable to the half-gallon sized glass container, " * * * The commission finds no testimony recommending a paper-glass differential for milk sold in any other sized container (than gallon sized containers) * * *."

The following colloquy is found in the record of the public hearing before Commission:

"Clark: You're recommending a paper differential for gallon paper over gallon glass. You're recommending this to the Board?

Haseotes: This is correct.

Clark: That we set a higher price on paper in a gallon container?

Haseotes: This is correct.

Clark: Do you also make the same recommendation on half-gallons in paper against a half-gallon in glass?

Haseotes: The differential between half-gallons of paper and half-gallons of glass in the markets in Massachusetts, Rhode Island and Connecticut, and so on, are from 3 to 5¢ per half-gallon unit. The difference between the glass gallon and two glass half-gallon is approximately 3¢. In other words, if the gallon is 85¢ in glass, plus a deposit, the half-gallons are usually 88¢ for two, plus the deposit, and this is what is prevailing throughout the markets of Massachusetts, Rhode Island and Connecticut."

A survey of the greater Portland area was made in 1962 by Professor Metzger which demonstrated that half-gallon paper containers were popular with the store customers.

"While the majority of families prefer the quart size container in making store purchases, one-third of the families bought the half-gallon size. A significant difference was indicated in the choice of the half-gallon between the households buying only from stores and those buying from retail routes as well. Thirty-five percent of the households buying only from stores purchased the half-gallon size and another 8 percent bought both half-gallon and quart size."

The Commission in its price schedule of April 1, 1965 made no differential between glass and paper containers of the half-gallon size, although there was a different price fixed between the gallon (glass) and the gallon (paper) of .85 and .89 respectively. The price of the half-gallon, either glass or paper container, was fixed at .47. No differential was made between a returnable or nonreturnable half-gallon container as was done in the category of the gallon container. This condition leaves the customer in the position of paying .94 for a gallon of milk purchased in two half-gallon containers (either glass or paper) with no distinction as to type of container. This would require a customer to pay 9 cents more for a gallon of milk than he would be required to pay had he purchased the milk in a one-gallon glass container. By the same token there is a 5¢ differential between two half-gallon returnable containers and one gallon returnable container.

■ The Metzger report shows a trend of the buying public in greater Portland to more retail store purchases of milk. Failure of the Commission to consider the cost saving factors of the use of glass containers which would warrant a price differential in the use of half-gallon containers is arbitrary.

■ We now consider (1) the prices fixed for "milk (white or flavored)" and (2) "skim (not flavored)." According to the scheduled prices the retail price of milk (white or flavored) per quart sold in retail stores is 24¢. A quart of skim milk (not flavored) sold at retail is 16¢. Plaintiff raises the question as to the price per quart of skim milk which is flavored as the Commission did not fix the retail price of flavored skim milk. The Commission contends that the retail price of 24¢ per quart of "milk (white or flavored)" is the same price which should be charged for flavored skim milk. In other words, a customer buying chocolate milk which is made up of skim milk pays the same price as does he who buys a quart of chocolate milk which is made with whole milk. It also appears to be true that a customer pays no more for plain whole milk or flavored whole milk, while the customer who buys flavored skim milk is charged 8¢ more a quart because it is flavored.

The pertinent statutory standards for milk in the instant case are provided by 7 M.R.S.A., Sec. 2901, sub-sec. 10:

> "*Flavored milk.* Flavored milk means a beverage consisting of milk to which has been added a syrup or flavor made from wholesome ingredients. Flavored milk shall not contain less than 3.25% milk fat. * * *."

sub-sec. 17:

> "*Milk.* * * * It shall contain * * not less than 3.25% milk fat. * * *."

sub-sec. 28.

> "*Skim milk.* Skim milk means milk which contains less than 3.25% milk fat * * *."

The Commission referred, in its supplemental findings, to the fixing of prices of whole milk (flavored and unflavored), skim milk (flavored and unflavored) in the following language:

> "The Commission finds the minimum resale prices established for flavored and unflavored skim milk to be just and reasonable, giving consideration to the cost factors involved. It was established that flavored skim milk offered for sale in Maine markets has an average milkfat content of approximately 2% with the added cost of flavoring. Unflavored skim, or fat-free milk, is, as the name implies, as free from milkfat content as practicable and processors strive for maximum milkfat of not more than ½ of 1%.

> "The Commission finds the added cost of milkfat and flavoring in flavored skim milk sufficient to warrant a minimum price comparable to that of whole white milk."

The Commission provides an 8¢ per quart differential between *skim* milk and milk. This differential obtains regardless of whether the *whole* milk lacks flavor or has flavor added to it. The statute requires that flavored milk shall not contain less than 3.25% milk fat and that skim milk shall contain less than 3.25% milk fat. The Commission by Ruling # 3 of Commission's Ruling dated April 1, 1964 provides:

> "Skim milk is hereby defined as that fluid product of milk which, after removal of cream, contains less than 2.25% butter fat."

Thus the Commission has established the butterfat content of skim milk to be 2.25%. At this point we have milk containing not less than 3.25% butterfat (white or flavored) selling for 24¢ per quart and skim milk containing not more than 2.25% butterfat (by Commission Rule) selling for 16¢, but as soon as the flavor is added the selling price is increased 8¢ per quart. The Commission found in its supplemental find-

ings, "the added cost of milk fat and flavoring in flavored skim milk sufficient to warrant a minimum price comparable to that of whole white milk." It is difficult to understand from the evidence why milk (white or flavored) which must contain not less than 3.25% butter fat is sold at the same price, while skim milk containing not more than 2.25% butter fat is 16¢ a quart, but if flavor is added it is 24¢ per quart. The Commission in its findings seeks to justify the added cost of 8¢ a quart when skim milk is flavored by holding that the 8¢ is justified because of "the added cost of milk fat and flavoring." The question could be asked if whole milk is permitted to be sold for the same price, whether flavored or not, why not the same rule be applied to skim milk. Certainly the cost of flavoring would be the same no matter what the base. This finding is discriminatory and arbitrary.

■ Cumberland contends that because the Commission established a gallon price differential concerning returnable container sales as against nonreturnable container sales that it should have established a price differential to cover half-gallon sales in similar containers. The Commission established a 4¢ differential between gallon returnable containers and gallon nonreturnable containers.

"The Commission finds testimony and evidence to support a differential of 4 cents for milk sold in single service as opposed to returnable gallon containers. The amount of this differential testified to most frequently fell within the range of 4 to 7 cents per gallon. However, dealers whose milk sales are entirely in non-returnable containers have, as a result of this type of distribution, effected certain economies thus warranting the lower 4 cents differential, while continuing to afford these dealers the opportunity to remain competitive with those distributing in returnable gallon containers." (Supplemental Findings).

A review and analysis of the testimony shows no error in the findings of the Commission in this category.

It is ordered.

Case remanded to the Maine Milk Commission for further consideration, review and clarification of its findings and conclusions relating to (1) Price differential for one-half gallon sales in single service containers (paper) as against returnable containers (glass); (2) Prices fixed for milk (white or flavored) and skim milk (not flavored).

RUDMAN, J., sat at argument but retired before the opinion was adopted.